## Erny Estate

596

598

600

602

*J. Peter Williams* and *Cuthbert H. Latta, Jr.,* for exceptant.

*Louis C. Washburn* and *Ernest Scott,* contra.

*John K. Young,* for accountant.

*Russell Conwell Cooney* and *Boyd L. Spahr, Jr.,* for contingent remainderman.

*Charles R. Weiner,* and *Bernard S. Cheskin,* for guardian and trustee ad litem.

*Joshua Eilberg,* trustee ad litem.

*Ralph C. Donohoe,* for Commonwealth.

### Opinion Sur Exceptions

LEFEVER, J., November 15, 1963.—We agree with the learned auditing judge that: "The Deed is remarkable in that upon every occasion where reference is made to the foster daughter, she is mentioned by name. The name 'Agnes' does not appear anywhere, but on every occasion the term 'wife' is used and following reference to her above cited, she is stated to be 'the said wife' or 'the wife of the said settlor' and in one clause she is described as '. . . the wife of the settlor if she then be living.' " In contrast, whenever settlor referred to his foster daughter he does so by name

"Thelma A. Erny." So also, when he refers to himself he does so by name, "Charles G. Erny".

This case is squarely ruled by Buzby Estate, 386 Pa. 1, and Stewart Estate, 390 Pa. 451.

There is no need to repeat what Judge Bolger has so ably stated in his adjudication.

The exceptions are dismissed and adjudication is confirmed absolutely.

President Judge Klein and Judge Burke did not participate in the deliberations or decision of this case.

### Dissenting Opinion

SHOYER, J., November 15, 1963.—Did settlor in creating joint life estates for his wife and foster daughter, Thelma, refer to his time-of-deed wife or his time-of-death wife? That is the sole question for decision.

His 1928 deed of trust, which is expressly made irrevocable, nowhere refers to his then wife, Agnes, by name although domestic harmony had apparently existed since their marriage in 1907. In August of 1934, they separated and in 1936, after a property settlement, they were divorced. Fifteen days later settlor married Mary, and she survived his death on January 6, 1963. Thelma also survives and is now entitled to one-half the income. Her claim to the additional one-half is opposed by Mary, who rests her demand on her status as settlor's widow, i.e., "the wife of the Settlor, living at the time of his death."

The deed of trust provides for income to settlor for life and after his death: "the Trustee shall pay the net income, one-half thereof unto the wife of the Settlor, living at the time of his death, as long as she shall live, and one-half thereof unto Thelma A. Erny, foster daughter of the Settlor, as long as she shall live." *

---

* Paragraph 5, top of page 2. The paragraphs in the original deed are not numbered, but the dispositive paragraphs starting with 5, as above, may be numbered for convenient reference to 10, inclusive.

Following death of "Settlor's said wife", paragraphs 6, 7 and 8 provide for her share of the net income to go to the "issue of their joint bodies living" till age 21 when they would receive principal, but if no such issue, or they should die before 21, then to Thelma, or her issue, or to Temple University, of which settlor was a trustee.

As to the other half of the income, Thelma's issue were to succeed to her share till 21, when they would receive principal.

Paragraph 10 provides for a cross remainder upon failure of Thelma's issue to "the wife of the said Settlor if she then be living", or "to *any* children of said Settlor living at the time of decease of Thelma", or to Temple University. (Italics supplied.)

Construction of a deed, like a will, requires that we look for the subjective intention of settlor as our polestar: Clark v. Clark, 411 Pa. 251, 255. "In order to ascertain the actual intent of the settlor or testator, the court must place itself in his armchair and consider not only the language and scheme of the instrument but also the facts and circumstances with which he was surrounded; and these surrounding facts and circumstances include the condition of his family, the natural objects of his bounty and the amount and character of his property". Pew Trust, 411 Pa. 96, 107. ". . . his intent must be gathered from a consideration of (a) all the language contained in the four corners of his will and (b) his scheme of distribution and (c) the circumstances surrounding him at the time he made his will and (d) the existing facts:" Burleigh Estate, 405 Pa. 373, 376. Only if the language is ambiguous or the intent *for any reason* uncertain, are we to rely on rules of construction: Burleigh Estate, supra, page 376.

If settlor actually intended "widow" by his designation in paragraph 5, as found by the learned audit-

ing judge, then at his death, absent a widow, not only would such "widow's" gift of income fail, but also the gift provided for her living issue in paragraph 6. Without a *widow*, there could be no widow's "issue of their joint bodies". All the income would go to Thelma, despite the existence of such living issue.

Such an intent could not be imputed to settlor. It would be too harsh, unjust and too extreme. It would be most improbable, and to state it is to reject it.

Similarly, any issue by Agnes who survived settlor's death, would be disinherited by the existing fact of Mary's widowhood. Again a most unlikely intent to be ascribed to settlor. If his intention was to provide for Agnes, his present wife who might survive him, an equal solicitude for any of her surviving issue would naturally follow.

Counsel for Mary contends that the gift to the issue would not fail but be accelerated, relying on March Estate, 357 Pa. 216; Walker's Estate, 344 Pa. 576; and Hurd's Estate, 305 Pa. 394. In all three of these cases the life tenants or remainderman, or both, were designated nominatim and as a consequence it was easy to discover testator's intention "accelerates the remainder in the absence of a manifestation of a contrary intent": March Estate, supra, page 218. Here, however, the beneficiaries are not stated nominatim and the identity of the one is indissolubly dependent upon the identity of the other. To approve Mary's claim as "widow" would inevitably identify "issue of their joint bodies" as *her issue only*. Such a construction would be tantamount to lifting oneself by one's bootstraps. Where the *identity* of wife, not merely *her right to take*, depends on her surviving settlor, it would be impossible to accelerate the remainder and at the same time waive this *sine qua non* as to the identity of all those issue claiming as beneficiaries.

Settlor's scheme of distribution to be followed after his own death is readily apparent. Income was to be divided into two equal shares. One share was to go to his wife or to the "joint issue of their bodies", the other equal share to Thelma or her issue. In the event of failure of issue, cross-remainders were provided but with this significant distinction. As to the first half share the cross-remainder would take effect upon failure of "issue of their joint bodies." As to Thelma's share, however, upon failure of her issue, the cross-remainder was to go to all or "any children of said settlor" then living, which would of course include issue by any other wife, or wives, of settlor. This is a clear indication that while Thelma could benefit by a failure of "joint issue" by a particular wife, Temple University could not take Thelma's share except upon a failure of *all* settlor's issue, not only the issue of "said wife" and "their joint bodies". To this extent settlor provided for issue by a wife other than Agnes regardless of how remote such possibility might be.

When we look at the attendant circumstances, we know that Agnes was then settlor's wife and the only wife he had ever had. Apparently she was in good health and there is no evidence that he then planned to divorce her. She was the *link* between settlor and Thelma, who was the daughter of Agnes' deceased sister. Thelma, then 10 years old, had been raised by settlor in luxury, with ponies and automobiles of her own. Mr. Erny had given her his name without the formality of legal adoption. It is true that settlor could have designated Agnes by name, but the generic term, wife, is surely precise and definite in a deed of trust executed under the circumstances existing here. Looking ahead in 1928 to likely beneficiaries to receive the income after his death, settlor certainly did not ignore his then wife and consider only some future wife. By

adopting the unique phrase "issue of their joint bodies", however, he was unequivocally restricting the succeeding beneficiaries of both income and principal to issue by the very same wife whom he designated in paragraph 5. For eight years after the execution of this deed he had no other wife but Agnes, so how can it be said that in executing this deed he intended to ignore her? This was a written instrument to take effect immediately, not a will which would be ambulatory until Mr. Erny's death. By its terms the deed was both "unalterable and irrevocable". Unlike a will, it probably dealt with but a portion of settlor's estate, much less than the whole. He was a businessman who would need free capital with which to continue his business. Had he asked the scrivener, he must surely have been told that Agnes as well as Thelma was receiving a vested life estate for the duration of their respective lives in that portion of his estate which he was then placing in trust.

Against the contention that settlor was referring to joint issue of Agnes and himself, Mary's counsel point to their 20 childless years, as putting such a possibility out of settlor's contemplation. The law recognizes no such limitation (Dickson Estate, 378 Pa. 48, 50) ; statistics refute it; (Kelby Estate, 80 D. & C. 1, 4) ; probability of issue drops only after age 50, and presumably Agnes was about 40 years old; and actual facts have occasionally disproved it. We cannot assume that settlor had abandoned all hope of issue by Agnes, and certainly he would naturally have provided for the happening of such a vital contingency no matter how remote. Yet issue by Agnes would be cut off without any provision whatsoever if he intended that wife "living at the time of his death" referred to other than Agnes.

It is a reasonable interpretation that in paragraph

10, settlor, out of extreme caution, was providing for *any* wife who might survive him *and for any and all* of his children. Thus upon failure of Thelma's issue there was a possibility that others beside Agnes and her issue might take before this share went to the university. Agnes' share, on the other hand, would go immediately to her niece, Thelma, or the latter's issue, should Agnes fail to have issue. Such acceleration over the other one-half would be appropriate recognition of the blood relationship between Agnes and Thelma and the probability, because of their respective ages, of the niece surviving her aunt. Thelma's counsel suggest that in paragraph 5 an elliptical construction would supply the missing conjunction "if". An elliptical form of expression is quite common in drafting written documents, and will be acknowledged whenever necessary to carry out settlor's undoubted intent: Lippincott's Estate, 276 Pa. 283, 288; Dolfinger Trust, 12 D. & C. 2d 264. I think this occasion so warrants.

If there be any doubt, a court may then resort to rules of construction. "It is a general rule of law that where a gift is made to a person described by relationship to another, even on a contingency that may not happen (to the widow of A), and where a person existing at the execution of the instrument meets the description or may fulfill the contingency, such person is intended as the beneficiary: Solms' Estate, [253 Pa. 293] 296, 298; Anshutz v. Miller, supra, 215; 57 Am. Jur. §§1385 and 1387, pp. 922 and 923; 95 C. J. S. §665, p. 974. Thus 'widow' would be construed as 'wife' and the ordinary rule of identification of beneficiaries would apply that they are determined as of the execution of the instrument: Solms' Estate, supra, 296; Anshutz v. Miller, supra, 215; Darrow Estate, 164 Pa. Superior Ct. 25, 30 (1949); Harrigan Estate, [72 D.

& C. 441] 441; Batchelor Estate, [67 D. & C. 310] 318; Breining Estate, 18 Lehigh 305, 307 (1939)": Dravo Estate (No. 2), 16 D. & C. 2d 106, 110. There is an additional rule that in speaking of his children or issue, a parent intends those likely to be born of an existing marriage rather than those who might be born of a marriage neither in existence nor which he is then free to make: Webb v. Hitchins, 105 Pa. 91, 14 W. N. C. 434; Sharpe's Estate, 15 W. N. C. 419. While the former of these rules was held not to be an inflexible rule of testamentary construction in Buzby Estate, 386 Pa. 1, 5, our Supreme Court there based its holding firmly on its interpretation that judicial construction of that layman's will neither required nor permitted "resort to technical rules of construction": (page 7). Likewise the award to the son's widow in Stewart Estate, 390 Pa. 451, was based on the clearly expressed intent of a substitutionary gift of income to the son's "wife him surviving", to take effect only if the son left no lawful issue to receive the corpus.

The learned auditing judge here gave undue emphasis to the fact that appearing before him was a claimant, Mary, who superficially fitted the description in paragraph 5 of "a wife of the settlor, living at the time of his death." He then ignored the other language in the four corners of the deed contrary to the first principle laid down for ascertainment of intent. The words of the entire instrument, not merely the words first used, *must* be considered: Vandergrift Estate, 406 Pa. 14, 26; Brown's Estate, 289 Pa. 101, 114.

At most, we have here a latent ambiguity which would warrant the introduction of evidence from the common pleas equity action to show settlor's intent: Beisgen Estate, 387 Pa. 425, 431; Miller's Estate (No. 1), 26 Pa. Superior Ct. 443. While settlor's motivation

in that proceeding to nail down the one-half share for Agnes is discernible, the evidence is admissible and should not have been dismissed by the learned auditing judge as irrelevant. It does confirm the construction already reached above.

Here the settlor's intent and applicable rules of construction unite in directing distribution of all the income from this irrevocable inter vivos trust to Thelma.