## Erny Trust.

Argued April 30, 1964. Before Jones, Cohen, Eagen, O'Brien and Roberts, JJ.

reargument refused July 24, 1964.

*Cuthbert H. Latta,* with him *Robert S. Ryan, J. Peter Williams,* and *Drinker, Biddle & Reath,* for appellant.

*Ernest Scott,* with him *Louis C. Washburn,* and *Pepper, Hamilton & Scheetz,* for appellee.

OPINION BY MR. JUSTICE JONES, July 1, 1964:

The very narrow issue which this appeal presents is whether the "settlor [of this irrevocable inter vivos trust] in creating joint life estates for his wife and foster daughter, Thelma, refer[ed] to his time-of-deed wife or his time-of-death wife?"[1]

Charles Erny (Erny), in 1907 married Agnes Erny (Agnes); of this marriage no children were born but Erny and Agnes took into their own home in 1922 and treated in all respects as their own daughter, one Thelma Lawry (Thelma), a niece of Agnes, to whom they gave the name Thelma Erny.

On January 12, 1928, Erny executed an *irrevocable* inter vivos deed of trust wherein the North Philadelphia Trust Company (now Girard Trust Corn Exchange Bank) was named trustee and to which trust Erny transferred assets having a then value of $250,-000. The presently pertinent provisions of that trust are:

A. "Upon the death of [Erny], the Trustee shall pay the net income, one-half thereof unto *the wife of [Erny], living at the time of his death, as long as she*

---

[1] As expressed in dissenting opinion of SHOYER, J. in the court below.

*shall live,*[2] and one-half thereof unto Thelma A. Erny, foster daughter of [Erny], as long as she shall live."

B.  "If upon the death of [Erny's] *said wife there are issue of their joint bodies living,*[2] said wife's share of the net income shall be paid by the Trustee [for the support of such issue until age 21 when such issue would be paid his or her share of principal]."

C.  If all "said issue" should die prior to reaching age 21, then their share would go to Thelma, if living, otherwise to Temple University.

D.  "If, upon the death of [Erny's] *said wife, there are no issue of their joint bodies living,*[2] the said one-half share of the net income shall be paid to Thelma A. Erny, foster daughter of [Erny]. . . ."

E.  Upon Thelma's death without issue or if all her issue surviving die before reaching age 21, "the Trustee shall pay the income to *the wife of [Erny] if she then be living*" with gifts over if "*the said wife* be then deceased."[2]

Erny and Agnes lived together harmoniously until 1934 at which time they separated and were divorced in May 1936. In that same month, Erny married Mary Erny [Mary], and they later adopted a daughter, Mary Carol Erny [Mary Carol]. Erny died on January 6, 1963, survived by Mary and Mary Carol.

At the accounting of the trustee in the Orphans' Court of Philadelphia County, occasioned by Erny's death, the question arose whether the gift under the trust of one-half share of the trust income went to Agnes [3]—Erny's wife at the time the trust was created—or to Mary—Erny's wife at the time of his death. The auditing judge found that Erny intended that

---

[2] Emphasis supplied.

[3] Agnes predeceased Erny. If the gift is held to be to her, then, since Agnes did not survive Erny and since there were no "issue of their joint bodies", Thelma would take Agnes' one-half share of the income.

the one-half share of the trust income given to Erny's "wife" should be paid to Mary and so decreed. Exceptions to that decree were dismissed by a four-judge court en banc, with SHOYER, J. dissenting.[4] From that decree, this appeal has been taken.

The majority of the court en banc believed that the issue was "squarely ruled" by *Buzby Estate,* 386 Pa. 1, 123 A. 2d 723, and *Stewart Estate,* 390 Pa. 451, 135 A. 2d 759. While we intend to consider in more detail both decisions, infra, yet at the outset we state our agreement with appellant [Thelma] that both *Buzby* and *Stewart* "teach": (1) that "the word 'wife' can be used either to designate a specific beneficiary, or in a generic sense"; (2) that "the intent of the [particular] settlor governs"; (3) that "[such] intent is to be determined without the benefit, or hindrance, of a presumption either way", i.e., that the word "wife" does not *inflexibly* and *immutably* refer to the wife who survives, when another was wife at the time the will or trust was made, or to the wife at the time the will or trust was made.

Our determination of the present issue must arise from a consideration of the language and scheme of distribution of this particular trust instrument considered in the light of all the circumstances under which this trust instrument was made: *Burleigh Estate,* 405 Pa. 373, 376, 175 A. 2d 838; *Turner Estate,* 408 Pa. 530, 534, 184 A. 2d 896.

As we examine the pertinent provisions of this trust instrument, we must bear in mind the circumstantial background which existed at the time this instrument was executed. At that time, Erny and Agnes had been husband and wife for upwards of twenty years and, insofar as the instant record reveals, their marriage was then harmonious and there was neither intimation nor suggestion that the mar-

---

4 Reported in 31 Pa. D. & C. 2d 595.

riage would not so remain in the future. Two persons would then, naturally, be the principal objects of Erny's bounty, Agnes and Thelma. By this trust agreement, Erny was *irrevocably* and *irreversibly* setting aside in a trust fund one-quarter million dollars; by so doing, he was placing beyond any possibility of his future control and dominion this very substantial portion of his assets.[5]

In paragraph A, supra, the one-half share of the net income of the trust is to be paid to "the wife of [Erny], living at the time of his death, as long as she shall live". Counsel for Mary contends that such language "points only to the wife of [Erny] living at the time of his death [Mary]." In support of such contention, it is argued that: (a) Erny's failure to designate Agnes *by name,* although continuously designating his foster daughter, Thelma, by name, reveals an intent to benefit the wife who would be his wife when he died; (b) that, having been childless in his 20 year marriage with Agnes and Agnes, then being 42 years of age, it is unlikely that Erny was then thinking of any possible children by Agnes, hence, in the use of the phrase "issue of their joint bodies", Erny must have been referring to his time-of-death wife; (d) that the phrase "living at the time of his death" clearly identifies the person contemplated by the word "wife" as the "time-of-death wife".

A review of the case law in Pennsylvania on the subject generally is of interest and significant. In

---

[5] Mary's counsel would have us read into this instrument the thought that Erny, with caution and clairvoyance, *then* had in mind the possibility that Agnes, by reason of death or divorce, might not be his wife at the time of his death. We can only interpret the state of mind of Erny at the time of the execution of this instrument by the language he employed therein and the circumstances that then existed; we find nothing on this record, save pure conjecture and surmise, to support the existence of any such thought on Erny's part.

*Anshutz v. Miller*, 81 Pa. 212, (1876), (an action of covenant on a case stated wherein the parties sought a ruling which directly affected the marketability of a title), the testator in his will had bequeathed the income from his estate to A "as long as he shall live, and after his death, his widow is entitled to said income; after her death it shall be distributed to [M.], daughter of [J.M.], and should [A.M.M.] the wife of [J.M.] survive, it shall go to her." A and L, his wife, together with M. and A.M.M. agreed to sell their interest in the estate to W.M. who refused to accept their deed on the ground that the will created a contingent remainder in favor of an unascertained person who might happen to be A's wife at the time he died. The Court held that the deed was not defective in that respect. In its ruling, the Court held: (a) that testator, by the word "widow", meant A's wife at the time the will was made; (b) "[w]here an estate is given to a person described by relation either to the testator or to other devisees, on a contingency that may or may not happen, and a person is in being at the time of the execution of the will, to whom, on the happening of the contingency, the description would apply, it is a *safe general rule* to hold such person is intended to be the devisee".[6] (Emphasis supplied).

Subsequent to, but without any mention of, *Anshutz,* came *Sharpe's Estate,* 15 W.N.C. 419 (1884), wherein a testator created a trust for his son under

---

[6] We refer herein to this rule as the "safe general rule". *Anshutz* was followed in *Jones's Estate,* 211 Pa. 364, 383, 60 A. 915; *Solms' Estate,* 253 Pa. 293, 296, 98 A. 596; *Darrow Estate,* 164 Pa. Superior Ct. 25, 30, 63 A. 2d 458; *Disston's Estate,* 46 Pa. D. & C. 496, 498; *Batchelor Estate,* 67 Pa. D. & C. 310, 318; *Harrigan Estate,* 72 Pa. D. & C. 441, 442; *Dravo Estate, (No. 2),* 16 Pa. D. & C. 2d 106, 110. See, however: *Buzby Estate,* supra, and *Stewart Estate,* supra, wherein *Anshutz* was distinguished and the "safe general rule", therein enunciated, discredited as an *inflexible* rule or *presumption.*

the terms of which the son received the income for life and, in case of the son's death, "his wife, Ada, and child or children" were to receive the income until the children reached 21 when the corpus was to be divided equally between "his wife, Ada, and child or children". The will was executed in 1871, at which time Ada, the son and a child of that marriage lived together; Ada and the son were divorced in 1872; testator died in 1873; the son remarried and died leaving a widow and two children; Ada, then childless, remarried. The court awarded one-half the fund to the divorced wife, Ada. In *Mellon's Estate,* 28 W.N.C. 120 (1891), wherein a gift over was provided, in a trust created by will, to one "Thomas Waller, the husband of my said daughter" and Thomas Waller was divorced from the daughter, who later died, the court (Penrose, J.) held that the gift to Thomas Waller by name, and not to him simply as husband, was not subject to the condition that Waller, at the time the gift would take effect, should be the daughter's husband, and awarded the gift to Waller. Parenthetically it might be noted that the court said: "We may conjecture, but we cannot be certain, that the inducing cause of the provision for Thomas Waller, was that he was the husband of the testator's daughter". (p. 120).[7]

In *Jones's Estate,* 211 Pa. 364, 365, 60 A. 915 (1905), the testator gave one-third of his estate "to my wife, Mary Brown Jones. . . ." When the will was drawn, Mary Brown Jones was testator's wife but, within one and one-half years thereafter, she divorced testator, the latter living about one year, eight months after such divorce. The Court, noting the gift was

---

[7] This Court, in an entirely different factual situation, in *Brown v. Ancient Order of United Workmen,* 208 Pa. 101, 57 A. 176 (1904), reached a similar result under a benefit certificate issued by a fraternal organization.

made without any condition or stipulation that Mary Brown Jones remain testator's wife or be such when he died, held the word "wife" was descriptive only and did not imply any continuing condition and, therefore, awarded one-third of the estate to Mary Brown Jones.[8]

In *Solms' Estate,* 253 Pa. 293, 98 A. 596 (1916), a deed of trust conveyed certain realty for the benefit of the grantor's son for life and, on his death, "to pay the said income . . . to the widow of said [son] should she survive him" for her life followed by a gift over on her death to the son's children. The son's wife predeceased him leaving children, the son remarried and, at his death, his second wife survived him. The second wife claimed the income but the property was awarded to the son's children to the exclusion of the second wife and we affirmed that ruling. In so doing, the Court approved the "safe general rule" of *Anshutz,* approved as a general proposition the rule in *Meeker v. Draffen,* 201 N.Y. 205, 94 N.E. 626, that "[u]nless there be something in a will indicating the contrary, a gift to the 'wife' of a designated married man is a gift to the wife existing at the time of the making of the will and not to one whom he may subsequently marry" but then noted the lack of any *inflexible* rule in Pennsylvania that the word "widow", used to denote relationship to a legatee or donee, *necessarily* means the wife who shall survive him, when another was his wife at the making of the will or trust deed, and concluded that the real intent of the settlor "should be determined by a consideration of the entire instrument, aided by the rules of construction" (253 Pa. at 298).

In *Darrow Estate,* 164 Pa. Superior Ct. 25, 63 A. 2d 458 (1949), the testator made a holographic will wherein he stated: "If anything should happen to

---

[8] As to a second question involved, the Court held the divorce did not impliedly revoke the bequest.

me I want my wife to have all of my property". At the time of the will, testator and Mabel Darrow had been married thirty-five years. Nine years after the will was made, testator and Mabel Darrow separated and were later divorced. Upon testator's death, Mabel Darrow claimed his estate under the will. The Court held: (a) the subsequent divorce alone did not revoke this will;[9] (b) in reliance on *Jones, Brown, Anshutz* and *Solms,* the designation of Mabel Darrow as "wife" was descriptive only and did not affect her capacity to take even though there was a subsequent divorce. In *Batchelor Estate,* 67 Pa. D. & C. 310 (HUNTER, J.) (1949), where the testator left a sum in trust to pay the income to his son for life "or his widow so long as she remains single" and, at the time, the son was married, the court construed the gift of income as a gift to that person who was the wife of the son at the time the will was executed. The Court relied, inter alia, on *Anshutz* and *Solms.* In *Harrigan Estate,* 72 Pa. D. & C. 441 (1950) (HUNTER, J.), testatrix gave her executor and trustee a sum of money to pay the income to her named nephew for life and the remainder at his death to his "wife and children share and share alike". At the time the will was made and at the time testatrix died, the nephew was married and had two children. The nephew and his wife were later divorced and the wife remarried; the nephew never remarried. Holding that a "reference to the wife of a legatee means one who occupied that relation at the making of the will and not the wife who shall survive him", in reliance on *Anshutz, Solms, Brown* and *Batchelor,* the court awarded the fund in equal shares to the divorced wife and children.

In *Buzby Estate,* supra, the testator, after bequeathing nine legacies to *named* legatees, provided

---

[9] Section 7(2), (3), of The Wills Act of 1947, 20 P.S. §180.7(2), (3) were inapplicable in *Darrow.*

that the balance of his estate should be bequeathed equally among his three sons with the proviso that the share of one son (P. W. Buzby) be placed in trust to pay the income to such son and "following him, wife and children" with a gift over on a failure of children. A codicil to that will directed that, if P. W. Buzby should predecease "his wife Rita M. Buzby", the latter would receive, in lieu of income, $1500 annually and the balance and principal were to be divided among the grandchildren. At the time the will was made, P. W. Buzby had been married 13 years to Rita, the latter then being 38 years of age and childless. Rita died 11 years after the will and 4 years after the testator's death, Buzby remarried, his second wife died and he again remarried and, at the time he died, he was married to a third wife. The third wife claimed, as his surviving wife, the income from the corpus of the trust. The lower court, relying on *Anshutz* and *Solms* and the *naming* in the codicil of Rita Buzby, held that the testator had intended Rita to share in the income. This Court reversed and awarded the income for life to the third, or "time-of-death", wife. In so doing, this Court, while distinguishing *Anshutz* and *Solms*,[10] rejected as *inflexible* the "safe general rule" enunciated in *Anshutz*. The rationale of *Buzby* is: (a) there is no *inflexible* rule of construction or a presumption arising from the use of the word "wife"; (b) the codicil, which named "Rita" as the wife, was not conclusive since the codicil, ultimately, was not dispositive of any of testator's estate; (c) had testator meant "Rita" as his wife, he could have so stated; (d) the use of the generic word "wife" was highly significant;

---

[10] In criticism of this Court's method of handling *Anshutz* and *Solms*, it has been said: ". . . the time has arrived for a clear-cut disapproval and elimination of Anshutz and Solms, rather than the continuation of the process of distinguishing them on miniscule and unimportant bases:" 20 Pitt. L. Rev. 415.

(e) the inclusion of the son's "children" with the "wife" as income beneficiaries indicated that testator did not contemplate Rita's children, of whom it was probable, after thirteen childless years, there would be none; (f) since the "children" of P. W. Buzby by any subsequent wife would qualify as income beneficiaries, ergo, the mother of such children should qualify; (g) the phrase "following him" identified "wife" as "time-of-death" wife.

In *Stewart Estate,* supra, the settlor in 1921 executed an inter vivos deed of trust providing for a life estate for settlor's son and directed that, upon the son's death, the trustee should deliver the securities of the trust to the son's lawful issue and, in the event there were no surviving issue, should pay the income "unto his [the son's] wife him surviving" for life. Settlor died in 1922 and the son in 1955, without issue. The son had five marriages. The son's second wife, i.e., the "time-of-trust" wife, and his fifth wife, i.e., the "time-of-death" wife, each claimed the income. This Court affirmed the award of income to the fifth wife. In so doing, the Court reaffirmed *Buzby* and considered that the second wife was not the "[son's] wife him surviving".

In *Dravo Estate (No. 2),* 16 Pa. D. & C. 2d 106 (1959), decided subsequent to *Buzby,* a settlor and his wife executed irrevocable trust instruments and, by his will, likewise created a trust by which they gave, after life estates for settlors, the net income of certain shares to Donald Pettit, a nephew, for life and, upon his death, said income was to be paid "to his widow during her life" and, upon the death of Donald Pettit and "his wife", the principal was to be paid to his issue then living and, on death without issue, the principal was to be paid to a certain charity. When the instruments were executed, Donald Pettit had a wife, Jane, and one child. After the settlor's death,

20

Donald and Jane were divorced and Donald remarried. The Court held that the words "widow" and "wife" meant Jane and awarded the income to her. The court, recognizing *Buzby* but relying in part on *Anshutz* and *Solms,* stated it "is a general rule of law that where a gift is made to a person described by relationship to another, even on a contingency that may not happen (to the widow of A), and where a person existing at the execution of the instrument meets the description or may fulfill the contingency, such person is intended as the beneficiary" and that " 'widow' would be construed as 'wife' and the ordinary rule of identification of beneficiaries would apply that they are determined as of the execution of the instrument". However, the court did recognize that such rule is not inflexible, as *Buzby* stated, and that reliance should primarily be placed on the intent of the settlor of the trust as evidenced by the language of the trust instrument. In *Dravo,* the court emphasized the importance of the language of the gift-over clause to the charity, i.e., "If . . . Donald Pettit and his wife should die without issue surviving them" and considered that such language suggested common issue rather than issue of Donald alone, that the phrase "Donald Pettit and his wife" treated Pettits as a couple, and that such language *strongly* suggested that a specific wife was in settlors' minds. The court concluded that the settlors intended by the words "widow" and "wife" the "time-of-the-trust" wife—Jane.[11]

---

[11] The result reached is in accord with that reached in many other jurisdictions: *Firth v. Fielden,* 22 Week Rep. (Eng.) 622; *Re Coley* (1921), 2 Ch. 102; *Garratt v. Niblock,* 39 Eng. Reprint 241; *Beers v. Narramore,* 61 Conn. 13, 22 A. 1061; *Johnson v. Webber,* 65 Conn. 501, 33 A. 506; *Van Syckel v. Van Syckel,* 51 N.J. Eq. 194, 26 A. 156; *Hill v. Aldrich,* 326 Mass. 630, 96 N.E. 2d 147; *In re Schluechterer's Estate,* 90 N.Y.S. 2d 867; *Gannett v. Shepley,* 351 Mo. 286, 172 S.W. 2d 857; *Lavender v. Rosenheim,* 110 Md. 150, 72 A. 669; *Scullin v. Mercantile-Commerce Bank &*

In reviewing this case law certain conclusions are to be noted: (1) all the cases, except *Solms* and *Stewart,* involved wills and not inter vivos trusts;[12] (2) all the cases, save *Jones* and *Darrow,* involved situations where the testator or settlor provided not for his own wife but the wife of another person;[13] (3) the intent of the testator or settlor evidenced by the language and scheme of the will or trust instrument, viewed in the light of the circumstances in which the will or trust instrument was executed, must control;[14] (4) the intimacy of relationship between the settlor or testator and the intended beneficiary is significant;[15] (5) while at first blush *Buzby* followed by *Stewart* would seem to represent a radical change in judicial thinking in this area of the law, yet an examination of both decisions reveals that all that the

*Trust Co.,* 361 Mo. 337, 234 S.W. 2d 597; *In re Fitzgerald's Estate,* 32 N.Y.S. 2d 1004, aff'd 37 N.Y.S. 2d 434; *Matheson v. American Trust Co.,* 246 N.C. 710, 100 S.E. 2d 77; *In re Lans' Estate,* 210 N.Y.S. 2d 611; *Rogers v. Rogers,* 22 N.Y.S. 2d 659, aff'd 28 N.Y.S. 2d 743. Contra: *Matter of Harris,* 152 App. Div. 52, 136 N.Y. Supp. 711, aff'd 206 N.Y. 690, 99 N.E. 1108; *Schettler v. Smith,* 41 N.Y. 328; *Meeker v. Draffen,* 201 N.Y. 205, 94 N.E. 626; *American National Bank v. Morgenweck,* 114 N.J. Eq. 286, 168 A. 598, aff'd 118 N.J. Eq. 269, 178 A. 727. See cases collected in: 63 A.L.R. 81; 18 A.L.R. 2d 697; 71 A.L.R. 2d 1273; 75 A.L.R. 2d 1413.

[12] A will may be changed at any time prior to death and is revocable until such time.

[13] Since Section 7(2), (3) of the Wills Act of 1947, 20 P.S. §180.7(2), (3), a will is modified by the subsequent divorce *of the testator* from his "time-of-will" wife.

[14] Illustrative thereof: (1) in Pennsylvania, *Solms, Buzby* and *Dravo;* (2) in other jurisdictions *Hill v. Aldrich,* 326 Mass. 630, 96 N.E. 2d 147; *Gannett v. Shepley,* 351 Mo. 286, 172 S.W. 2d 857.

[15] Illustrative thereof: (1) in Pennsylvania, *Anshutz* and *Buzby*; (2) in other jurisdictions, *In re Friend's Estate,* 6 N.Y.S. 2d 205, aff'd 12 N.Y.S. 2d 1008, aff'd as mod. 283 N.Y. 200, 28 N.E. 2d 377; *Gannett v. Shepley,* supra; *In re Wainwright's Estate,* 82 N.Y.S. 2d 345.

Court did therein was to negative the existence of any *inflexible rule* or *presumption* arising from the words "wife" or "widow" in a will or deed of trust as to the identification of the person intended to take a legacy or devise and to direct that the identification of the person intended by employment of the words "wife" or "widow" be determined by the language and scheme of the particular instrument viewed in the light of the circumstances existing at the time of its execution; (6) the results reached in *Buzby* and *Stewart,* having been arrived at by an examination of the particular instrument and circumstances in each instance involved, are *sui generis* and do not control the construction of the intent of Erny in the case at bar. *Buzby* and *Stewart* do not "rule" this case; only the language of the instrument and the circumstances involved determine the intent of Erny.

The first reference in this trust deed to a "wife" appears in the settlor's direction that, upon his death, the trustee pay one-half of the net income "unto the wife of the settlor [Erny]." *Per se,* under *Buzby* and *Stewart,* the word "wife" does not indicate whether Erny meant a *specific wife,* i.e., Agnes, or a *wife generically,* i.e., inclusive of Mary. However, we must consider the circumstances under which "wife" was used. Erny, then a happily married man, could only have been thinking of Agnes, who was *then* the *only* wife he had and we cannot, by conjecture and surmise, attribute to Erny a prescience of future events when he might acquire another and different wife. While there is no *inflexible rule* or *presumption* that the word "wife" means only the "time-of-the-instrument" wife (*Buzby* and *Stewart,* supra), yet we must recognize that *generally* a settlor, about to draw a deed of trust or a testator about to draw a will, thinks in terms of his *then* wife and not in speculation of a possible future wife *(Dravo,* supra). Even though the

word "wife" *per se* is inconclusive, the circumstances under which Erny executed this trust deed would tend to indicate he could only have been thinking in terms of Agnes, his *then* wife.

Following the word "wife" is the phrase "living at the time of his death".[16] Appellee argues that, when contrasted with the settlor's direction (later in the trust deed) that, upon Thelma's death without issue or without issue not reaching 21 years, the "wife" was to take "if she then be living", the phrase "living at the time of his death" can mean only the "time-of-death" wife. Appellant contends that by this phrase Erny could have meant his then wife, if she survived him, or could have "intended a rolling generic gift to whoever might be his surviving wife" and that, standing alone, such phrase is inconclusive. We are inclined to the opinion that such phrase is inconclusive. Certainly, when considered with other language in the instrument, with the general scheme of the disposition of income and principal and with the circumstances existing when the deed of trust was executed, we cannot, with any degree of conclusiveness, read "living at the time of his death" as "my wife who shall be my wife at the time of my death" rather than "my wife if she be living at the time of my death".

Appellee further contends that the fact Agnes is never mentioned *by name* in the deed of trust whereas the foster daughter, Thelma, is always mentioned by name is most significant. Bearing in mind that Thelma was related neither by blood nor adoption to Erny (although no doubt very near and dear to him) that, although neither kith nor kin, she occupied the status of a daughter without being so regarded in

---

16 "Living at the time of another person's death means simply, in its ordinary interpretation, remaining in life after the death of that other person": *Sabit v. Safe Deposit & Trust Co. of Baltimore*, 184 Md. 24, 38, 40 A. 2d 231, 238.

the eyes of the law, and that Thelma's status in the Erny household was factual, not legal, it is entirely understandable that whenever Erny referred to her he did so by name as well as by status. On the other hand, Agnes' status was certain. She was Erny's wife and his only wife, and it is understandable why Erny would believe there could be no doubt or ambiguity as to the identity of the person he identified as "the wife of the settlor", i.e., his then wife, and that there was no necessity to refer to such "wife" by name. It might be noted that, even where a "wife" was *named* as in the codicil in *Buzby,* this Court considered such identification of no great significance. Appellee's contention in this respect, as we view this instrument and its circumstantial background, is without particular significance.

We must look to Erny's scheme providing for the ultimate disposition in this trust of the one-half share of the income given to the "wife of settlor [Erny]" initially. In the first place, the phrase "as long as she [the wife of the settlor] shall live" simply describes the quantum of the estate in the income, i.e., a life estate, which Erny's "wife" was to receive; it does not aid in the identification of the "wife" of the settlor. In the second place, settlor provided that, "upon the death of settlor's said wife", if there are "issue of their joint bodies living", such issue shall take the "wife's" share of income until they each reach 21 years. What does the phrase "issue of their joint bodies" mean? We have said that "issue" means "issue of the body, offspring, progeny, natural children, physically born or begotten by the person named as parent. . . ." *(Howlett Estate,* 366 Pa. 293, 299, 77 A. 2d 390) and that "[i]ssue strongly connotes a blood relationship which arises solely by actual birth of the child to the parent" *(Collins Estate,* 393 Pa. 195, 209, 142 A. 2d 178). "Issue of the body" is generally held synonymous with "children": *Daniel v. Wharten-*

*by,* 84 U.S. 639, 17 Wall. 639; *City National Bank v. Slocum,* 272 Fed. 11, 18; *Palmer v. Horn,* 84 N.Y. 516; *Strain v. Sweeney,* 163 Ill. 603, 45 N.E. 201, 202. In *Bailey's Estate (No. 1),* 276 Pa. 147, 119 A. 907, we held "joint issue" to be inclusive of *all* the children born to a testator and his wife. While neither our research, nor that of counsel, has revealed any decision defining the phrase "issue of their joint bodies", it is clear to us that this phrase in the case at bar can only mean "children born of the joint parentage of Erny and his wife". Thus defined, this trust provides that if there are "children born of the joint parentage of Erny and his wife", such children, on the wife-mother's death, receive the income until they reach 21 and the principal thereafter. If there are *such* children and all die before reaching 21, then Thelma, the blood relative of Agnes, receives the one-half share of the net income and if, upon the "death of the settlor's said wife", there are no children of the joint marriage of settlor and his wife living, Thelma takes the one-half share of the net income.[17]

The language of these gifts over of the "wife's" share of income must be contrasted with the language of the gifts over of Thelma's share of income. The issue of Thelma are described as "the issue of said Thelma", "to her issue" and, if Thelma dies "without leaving issue" or "if all her issue die before reaching 21 years", Thelma's share of the income, if settlor's wife is not living, is payable *"to any children of said settlor"* (not of settlor and his said wife) or "until such issue" reach 21 years.[18] As Judge SHOYER said, in dissent: "This is a clear indication that while Thelma could benefit by a failure of 'joint issue' by a particular wife, Temple University [the ultimate con-

---

[17] Assuming, of course, Thelma is living when these events occur.

[18] The language in *Dravo* was much less strong than in the case at bar.

tingent beneficiary] could not take Thelma's share except upon a failure of *all* settlor's issue, not only the issue of 'said wife' and 'their joint bodies'. To this extent [Erny] provided for issue by a wife other than Agnes regardless of how remote such possibility might be."

Furthermore, as Judge SHOYER stated, 31 Pa. D. & C. 2d at 605: "If settlor actually intended 'widow' by his designation in paragraph 5, as found by the learned auditing judge, then at his death, absent a widow, not only would such 'widow's' gift of income fail, but also the gift provided for her living issue in paragraph 6. Without a *widow,* there could be no widow's 'issue of their joint bodies'. All the income would go to Thelma, despite the existence of such living issue.

"Such an intent could not be imputed to [Erny]. It would be too harsh, unjust and too extreme. It would be most improbable, and to state it is to reject it.

"Similarly, any issue by Agnes who survived [Erny's] death, would be disinherited by the existing fact of Mary's widowhood. Again a most unlikely intent to be ascribed to [Erny]. If his intention was to provide for Agnes, his present wife who might survive him, an equal solicitude for any of her surviving issue would naturally follow.

"Counsel for Mary contends that the gift to the issue would not fail but be accelerated, relying on [certain cited cases]. In all three of these cases the life tenants or remaindermen, or both, were designated nominatim and as a consequence it was easy to discover testator's intention 'accelerates the remainder in the absence of a manifestation of a contrary intent': [citing a case]. Here, however, the beneficiaries are not stated nominatim and the identity of the one is indissolubly dependent upon the identity of the other. To approve Mary's claim as 'widow' would inevitably identify 'issue of their joint bodies' as *her*

*issue only.* Such a construction would be tantamount to lifting oneself by one's bootstraps. Where the *identity* of the wife, not merely *her right to take,* depends on her surviving settlor, it would be impossible to accelerate the remainder and at the same time waive this *sine qua non* as to the identity of all those issue claiming as beneficiaries."

With Judge SHOYER we agree.

Neither *Buzby* nor *Stewart* rule the case at bar; each dealt with different language in the instruments each construed and with far different circumstantial background. Moreover, *Buzby* and *Stewart* in dealing with their peculiar factual situations are sui generis.

A reading of the language of this trust instrument, whereby irrevocably and irreversibly Erny placed beyond his future control a substantial portion of his assets, considered in the light of the circumstances surrounding its execution, convinces us that he intended by the word "wife" the *only* "wife" he *then* knew, Agnes. Any other interpretation of this trust deed would attribute to Erny a clairvoyance beyond the ken of the ordinary person. Considering the language of the trust deed in its entirety and the totality of all the circumstances, it was Agnes to whom Erny referred as his "wife", not some future wife.[19]

Decree reversed. Costs on Estate.

---

[19] On April 12, 1935, Erny petitioned Court of Common Pleas No. 4 of Philadelphia County to reform the deed of trust to identify *by name* Agnes A. Erny as the person referred to as the "wife" of the settlor. The auditing judge took the position that "none of the action which took place in the Court of Common Pleas [was] relevant to the decision in this case". With this conclusion, the dissenting judge disagreed. Although the admissibility of such evidence was argued by the parties, we need not pass thereon since, in our view, the language of the deed of trust and the circumstances surrounding its execution clearly identify, *without such evidence,* the person intended by Erny's reference to "wife".